CATER CONST. CO., Inc., et al. v.
NISCHWITZ et al.

No. 7214.

Circuit Court of Appeals, Seventh Circuit.
April 30, 1940.

Rehearing Denied May 20, 1940.

John J. Moreschi, of Chicago, Ill., Vincent Morreale, of Washington, D. C., and David Fisher and Howard Ellis, both of Chicago, Ill., for appellant.

Emory J. Smith, of Chicago, Ill., and George B. Gillespie, Edmund Burke, and Louis F. Gillespie, all of Springfield, Ill., for appellee.

Before MAJOR and KERNER, Circuit Judges, and LINDLEY, District Judge.

MAJOR, Circuit Judge.

This is an appeal from a temporary injunction order, entered by the District Court December 13, 1939, enjoining the defendant from interfering by threats, violence and other unlawful acts, with the construction by the plaintiffs of certain rural electrification projects in Southern Illinois.

Plaintiffs are the Cater Construction Company, Inc., a corporation (hereinafter referred to as the "Cater Company") and the Donovan Contracting Company (hereinafter referred to as the "Donovan Company"). The defendants are named in their individual capacities, as well as members and representatives of various local unions of the International Hod Carriers Building and Common Laborers Union of America (hereinafter referred to as the "Common Laborers Union"), and of the International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers of

America (hereinafter referred to as the "Teamsters Union").

Primarily, defendants' appeal raises two questions, (1) are the findings of fact made by the District Court sustained by substantial evidence? and (2) do the pleadings, findings and decree conform to the provisions of the Norris-LaGuardia Act, 29 U. S.C.A., §§ 101–115)? Defendants also argue that the court erred in the admission and exclusion of testimony.

A motion was made to dismiss plaintiffs' bill of complaint on the grounds that the allegations thereof were insufficient to show compliance with the Norris-LaGuardia Act, which Act, plaintiffs concede, is applicable. Section 107 of the Act precludes the issuance of an injunction in a labor dispute except upon the conditions specified therein. In substance, it must be alleged and proved (a) that unlawful acts have been threatened or committed unless restrained, (b) that substantial and irreparable injury to complainant's property will follow, (c) that as to each item of relief granted, greater injury will be inflicted upon the complainant by the denial of relief than will be inflicted upon the defendant by the granting of relief, (d) that complainant has no adequate remedy at law, and (e) that the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection. Section 108 prohibits injunctive relief to a complainant who has failed to make every reasonable effort to settle such dispute either by negotiation, mediation or voluntary arbitration. Admittedly, the allegations of the bill may be said generally to allege compliance in the language of the statute. It is argued by the defendants that these allegations merely amount to the conclusions of the pleader and, that there was, therefore, a failure to state a cause of action. We are unable to discuss in an opinion of reasonable length the allegations of the bill intended to show compliance with the Act. The argument made regarding the insufficiency of the bill to show conformity with Section 107(e) is typical of that concerning other requirements. The bill discloses where the work was being done and where protection was sought as to both the Cater Company and the Donovan Company projects. Thus, it was shown in each instance the public officers charged with the duty of protecting plaintiffs' property. As to the Cater Company, the bill alleged: "That the Cater Co. 'through its representatives, re-quested the Chief of Police of the City of Edwardsville, Illinois, to give it and its employees protection against mobs assembled by said persons, and was notified by said Chief of Police on said occasion that the best thing Plaintiff could do to prevent violence would be to accede to the demands of the Defendants' union; that thereafter this Plaintiff, through its representatives, applied to the Sheriff of Madison County for protection for its employees and property, and on said occasion was notified by said Sheriff that he could not incur the expense of deputizing enough persons to give the protection needed, and, by reason of the premises the Plaintiff avers that the public officers charged with the duty to protect Plaintiff's property and employees on said project are unable or unwilling to furnish adequate protection.' "

A similar allegation was made with reference to the Donovan Company and the sheriff of the appropriate county. We think such allegation was sufficient. It may be true, as argued, that the allegation represents the conclusion of the pleader, yet we think it amounts to an ultimate fact. It is a familiar rule of pleading, particularly applicable here, that evidence by which an allegation is sought to be established need not be pleaded. Apparently defendants' contention would require a narrative of all communications, oral or written, between the one seeking protection and the officers, from whom the protection was sought. Such matters, however, are for proof and we doubt the propriety, much less the necessity, of their allegation. Rules of Civil Procedure for the District Courts, 28 U.S.C.A. following section 723c, require that "each averment of a pleading shall be simple, concise, and direct." Section 8(e) (1). Substantially the same defects are claimed as to the allegations concerning other requirements of the Act. We conclude that the court properly overruled the motion to dismiss the bill. Donnelly Garment Co. v. International L. G. W. Union, 8 Cir., 99 F.2d 309, 312.

Concerning the facts, it appears sufficient to give a summary which largely we take from the findings as made by the District Court. Plaintiffs had contracts for the construction of certain rural electrification projects; the Cater Company in Madison County and the Donovan Company in Jackson County, Illinois. The contract of the former called for the construction of a power line for the Southwestern Electric Co-

operative, Inc., in Madison County, and the latter for the construction of a similar project for the Egyptian Electric Cooperative, Inc., in Jackson County. These contracts were made pursuant to the provisions and conditions of the Rural Electrification Act of 1936, 7 U.S.C.A. § 901 et seq., under which the Federal Government loaned money to the co-operatives for the purpose of financing such projects. The Federal agency required, among other things, a scale of minimum wages, determined by it, to be paid persons employed on such projects and, that maximum hours of labor be designated, reports of which were required to be submitted to the United States Department of Labor.

In connection with its contract, the Cater Company, in April, 1939, made a verbal agreement with the International Representative of the International Brotherhood of Electrical Workers of America (hereinafter referred to as the "I.B.E.W."), by which the latter was obligated to furnish both the skilled and unskilled labor on such project. The contract provided the rate of pay per hour for each class of labor. At about the same time the Donovan Company made a similar contract in writing with I.B.E.W. for all of its work in Southern Illinois, including the project here involved. At the time of the various occurrences complained of, the plaintiffs were operating under such construction and labor contracts. It is conceded that none of the defendants was or ever had been in the employment of the plaintiffs. Soon after the making of the Cater Company contract, the president of the company was notified by a representative of the Common Laborers Union that it would be required to employ members of such union for common labor on the project, or the work would not be done. The officials of the Cater Company were told on several occasions that members of the Teamsters Union would operate their trucks and, that members of the Common Laborers Union would do their ground work, or they would not be permitted to operate, and if the company proceeded contrary to such instructions, there would be a fight. On October 17, 1939, twelve or fifteen carloads of men, including at least five of the defendants,[1] came on the Cater Company job, threatened the men who were at work, used vile and profane language, and committed a brutal assault upon one of such employees. They were requested and warned to quit work. By reason of intimidation and fear, they quit their work, which was not resumed until after the hearing in the District Court.

Under the Cater Company contract with the Southwestern Electric Cooperative, Inc., the project was to be completed within 100 calendar days, and in default thereof, a penalty of $25 per day was imposed for each day of delay beyond the completion date. At the time the work was stopped, the Cater Company had an aggregate of $60,000 worth of material on the job and $30,000 worth of equipment, with an expense of $125 for each day it remained idle.

The superintendent and general chairman of the Cater Company, following the threats made by the defendants, and before the violence of October 17th, made application to the sheriff of Madison County for protection. The sheriff stated that he knew there was trouble between the parties but that it was the policy of his office not to do anything until something happened; that unless some crime or assault was reported, he would not act. He further stated that he did not have the facilities or financial means to patrol these different jobs throughout the county. The warehouse of the Cater Company, where the supplies were kept and where their employees assembled in the mornings before leaving for their work, mostly in the country, was located in the City of Edwardsville. The chief of police of that city, when asked for protection so that the employees of the Cater Company might leave the warehouse for their jobs, replied: "My advice to you would be to do what these unions want you to do and you would get along." He also stated in effect that he only had one policeman in the day time and that one man would be of no value against a crowd.

The Donovan Company had a contract with the I.B.E.W. similar to that of the Cater Company. About the middle of September, 1939, it was notified by an official of the Common Laborers Union that his union wanted the labor on this job. On

---

[1] No question is raised as to the propriety of the injunction order as to any particular defendant. In other words, the argument in favor of reversal applies alike to all defendants. It therefore seems unnecessary to identify the defendants by name, or relate which of them made the threats or committed the acts complained of.

October 6, other defendants representing the defendant's unions informed the company that the labor belonged to them and not to the I.B.E.W. On that occasion an official of the Common Laborers Union presented to the superintendent of the Donovan Company a proposed contract by which the company would have been bound to employ members of that union. Upon the refusal of the superintendent to sign, he was told: "You had better shut this job down by noon or suffer the consequences, if you don't shut it down." At that time twenty or twenty-five men, including some of the defendants, were outside the offices of the company. On the same morning, one of the defendant officials sent two men out with the Donovan Company superintendent to make sure that the men were not working and that the job was shut down. Work ceased in order to avoid injury to the employees. A few days later, work was resumed on the project when a defendant official, accompanied by from twenty to thirty men, went to the offices of the Donovan Company and warned the employees not to go to work. The men went to work that day and on the following morning, the same defendant official notified the company that if they sent their men out to work that morning they would have trouble, as he was stopping the job. A few minutes later, the same official returned with fifteen or eighteen automobiles loaded with men and stopped across the street from the Donovan Company men. One truck was sent out by the company, but forcibly halted and turned back by defendants. There was no further attempt to work prior to the hearing in the District Court. Prior to this time, an official of the Common Laborers Union had advised the Donovan Company that the common labor work was under the jurisdiction of its union; that the company would have to let them have it and, that the I.B.E.W. had no jurisdiction over such labor. When asked by a company official what he would do about it, the official of the Common Laborers Union said: "One way is, there will be a lot of heads busted," and that the work would be stopped in that manner. The Donovan Company had a penalty provision in their project contract of $25 per day and suffered an idle expense of $75 per day for each day they were prevented from working. At the time they were stopped they had in use on the project $7000 worth of equipment and $60,000 worth of material. The sheriff of Jackson County was informed of the situation and called upon by the Donovan Company for protection. He stated: " * * * inasmuch as they were connected with the Federal government and responsible to the Federal government, and inasmuch as we were not able to furnish them men to patrol it, they should apply to that branch of the service. * * *" A representative of I.B.E.W. also requested the sheriff for protection on the Donovan Company project and was informed, in effect, that it was a Federal matter, that he could not deputize a lot of men and, that he would not protect the job.

Representatives of the Donovan Company met with representatives of I.B.E.W. and the defendant unions for the purpose of settling the question as to which labor union had jurisdiction of the common labor, but no agreement was reached.

The court below found that the requirements of Section 107 of the Norris-LaGuardia Act had been complied with, and that as to both the Cater Company and the Donovan Company, substantial and irreparable injury had resulted and would continue to result by reason of the unlawful acts committed and threatened against said companies. No useful purpose would be served by a detailed discussion or analysis of the testimony. It is sufficient that we have examined the record and are satisfied the findings of the District Court are substantially supported and, therefore, must be accepted by us in our consideration of the law applicable thereto. Much of defendants' argument regarding the interpretation of the Norris-LaGuardia Act, as well as their argument concerning the refusal of the court to admit certain testimony, is beside the point for two reasons, (1) plaintiffs had a legal and binding contract with the I.B.E.W. for the work to be done on the projects, and (2) the defendants, by threats, intimidation, coercion and violence, sought to prevent the work being done according to such contract.

Plaintiffs stress the fact that there was a jurisdictional dispute between the I.B.E.W. and the defendant labor unions concerning the common labor to be used upon these projects. Defendants minimize the importance of this situation, and while not denying that a jurisdictional dispute existed, argue that their chief purpose was to maintain the wage scale adopted by their organizations and in effect in Madison and Jackson Counties. The District Court adopted plaintiffs' theory in this respect

and we think properly so, but if it be conceded that the primary purpose of the defendants was as argued, we still are of the opinion that their position is not tenable. It is argued that the defendant unions were under contract with the contractors of those communities to use every lawful means to see that their scale of wages was maintained. No fault can be found with their contention in this respect and they were within their rights in employing any lawful means to accomplish such purpose. If such means had been employed only, they would not have been subject to the injunctive power of a court. In New Negro Alliance v. Grocery Co., 303 U.S. 552, on page 562, 58 S.Ct. 703, 82 L.Ed. 1012, at page 707, concerning the purpose of Congress with reference to the prohibitions contained in the Norris-LaGuardia Act, the court said: " * * * It was intended that peaceful and orderly dissemination of information by those defined as persons interested in a labor dispute concerning 'terms and conditions of employment' in an industry or a plant or a place of business should be lawful; that, short of fraud, breach of the peace, violence, or conduct otherwise unlawful, those having a direct or indirect interest in such terms and conditions of employment should be at liberty to advertise and disseminate facts and information with respect to terms and conditions of employment, and peacefully to persuade others to concur in their views respecting an employer's practices. * * *"

As the court found, however, and as the record discloses, the defendants did not confine their efforts to peaceful persuasion or lawful means, but went far beyond and sought to accomplish their purpose by unlawful acts. Under such circumstances, considering the matter merely from the legal aspects of the situation, as we must, we do not think it is of controlling importance whether or not there was a jurisdictional dispute. Other arguments presented by the defendants, having to do with the claim that the I.B.E.W. issued permits to those who are not members of the union, that they were being paid less than defendants' scale, or that they were not residents of the respective localities, are, for the same reason, immaterial.

So far as we are informed, an employer has the same legal right to employ labor on favorable terms as has the employee, either individually or collectively, to obtain for his services the best possible compensation. No contention is made but that the I.B.E.W. was a bona fide labor organization—in fact, it had been in existence for almost fifty years. We are not here concerned with the question of a company dominated or controlled union, as is often the case under the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. Even under that Act, the Supreme Court has held that an employer has the same right to employ non-union as union labor. Labor Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 45, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352. So, in the instant case, we think it is immaterial to the issue presented whether the employees of I.B.E.W. were members of a union, or the scale of wages at which they were employed. Such a situation, if it existed, could, in no wise, affect the validity of the contract between I.B.E.W. and plaintiffs. It must not be overlooked that plaintiffs' employees were not complaining, but that the complaint was made by non-employees.

Much of defendants' argument, as stated, has to do with matters largely foreign to the issue before the court. This is illustrated by the last statement in defendants' reply brief. After seeking to justify the defendants in their effort to maintain the wage scales of their unions, it is said: "This the defendants had the right to complain about, to talk about, to advertise, to picket and to use all lawful means to counteract." We agree with this statement, but it has no application for the reason that the defendants, by the use of unlawful means, exceeded such rights.

The most serious complaint concerning a failure to show compliance with the Norris-LaGuardia Act is directed at Sections 107(c), 107(e) and Section 108, 29 U.S.C.A. Section 107(c) requires "that greater injury will be inflicted upon complainant by the denial of relief than will be inflicted upon defendants by the granting of relief." Defendants argue that there is no proof in support of this requirement. As to each of the plaintiffs, it was shown that their contracts were to be completed within a certain specified time and, thereafter, the plaintiffs would suffer a penalty of $25 per day. As to the Cater Company, it had materials on the job worth $60,000, and equipment worth $30,000, with an idle loss of $125 per day. As to the Donovan Company, it had equipment valued at $7,000, and materials valued at $64,000, with an idle expense of $75 per day. De-

fendants argue that this loss is not to be compared with that sustained by them in the way of work, wages, destruction of wage scales and loss of union prestige. Such losses, however, were speculative in character and we do not think could overcome the direct measurable losses sustained by the plaintiffs. If the court were to deal in speculation as to defendants' losses, it was also entitled to deal in speculation as to losses which might have been sustained by the plaintiffs by breach of its contract with the I.B.E.W., which at all times was demanding the fulfillment of its contracts.

 We also think there was ample warrant for the finding of the court in respect to section 107(e). It is plainly shown that the appropriate law enforcing officers were unable, and apparently unwilling, to furnish the necessary protection. The work on both projects was largely in the country and adequate protection would have required a large number of deputies, which neither sheriff had. With knowledge of the existing situation, they neither furnished nor offered to furnish protection. Their actions speak louder than words. It is pointed out that the sheriff of Madison County, in one instance, arrested some of the defendants after they had assaulted one of plaintiffs' employees. We do not think, however, as might be implied from defendants' argument, that this is sufficient to show protection. No doubt the protection which the statute contemplates is, that which would have enabled the plaintiffs to proceed with work on the projects. No such protection was forthcoming. The chief of police of the City of Edwardsville may be placed in a similar category. He had one officer available other than himself, which, as he stated, would be of no value against a crowd. His answer to the call for protection was that the plaintiffs do what the defendants wanted done.

 It is also urged that there was no compliance with Section 108, in that no reasonable effort was made to settle such dispute by negotiation, mediation or voluntary arbitration. It is plaintiffs' position that this section has no application where violence and threats of violence are committed, as in the instant case. There is cited in support of this contention Newton v. Laclede Steel Co., 7 Cir., 80 F.2d 636, 638; United Electric Coal Companies v. Rice, 7 Cir., 80 F.2d 1, 8, and Donnelly Garment Co. v. International L. G. W. Union, 8 Cir., 99 F.2d 309, 317. We think the court's reasoning in those cases is sound, and is especially applicable to the instant situation. The officials of the I.B.E.W. refused to negotiate with the officials of the defendant unions. It is difficult to perceive with whom or in what manner plaintiffs could have negotiated with any hope of success. Having contracted with the I.B. E.W., they had no right or authority to contract with the defendants concerning the same work. Under such circumstances, negotiations with the defendants would have been futile, with no hope of settling the dispute. As is discussed and shown in the Donnelly case, it would seem that Congress did not intend to require an employer to negotiate or mediate a dispute with those who were, by intimidation, coercion and violence, threatening the destruction of its property and the right to work of those under legal contract.

 Complaint with reference to the admissibility of testimony has to do largely with the limited cross-examination which was permitted of plaintiffs' witnesses. Without going into detail, the subject matter of the inquiry may be stated generally, we think, to have been concerning matters immaterial to the issue before the court. For instance, it was sought to show what knowledge plaintiffs had regarding labor conditions in Madison and Jackson Counties, wage scales in effect there, the wage scale paid by plaintiffs on other projects, whether union or non-union men were employed thereon, what dues and initiation fees were paid by members of defendant unions, the fact that defendant unions were given jurisdiction of the common labor on other projects, how many of the men employed by plaintiffs came from outside the state, whether I.B.E.W. had established a wage scale in each of the southern counties of the state, and the obligation assumed by the defendant union to enforce its wage scale in the territory in question. As stated, most of the information sought was irrelevant to the issue being tried. We do not believe defendants were prejudiced by the action of the court in this respect.

 It is also contended that the injunction order is so broad and sweeping in its terms as to be violative of Section 109 of the Norris-LaGuardia Act. No particular paragraph of the order, however, is called to our attention which supports defendants' contention. After reading the order, we think it is in substantial compliance with the Act. The acts prohibited

by the order were complained of in the bill of complaint and are included in the findings of fact as made by the court. Only unlawful acts are prohibited by the order, and we do not believe the Act places any limitation upon the court's authority to enjoin all unlawful acts complained of and found to exist.

The injunction order of the District Court is affirmed.