RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 11a0200p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

PULTE HOMES, INC., a Michigan Corporation,
         *Plaintiff-Appellant,*

         *v.*

Nos. 09-2245; 10-1673

LABORERS' INTERNATIONAL UNION OF
NORTH AMERICA; TERENCE M. O'SULLIVAN;
RANDY MAYHEW,

         *Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 09-13638—Lawrence P. Zatkoff, District Judge.

Argued: December 9, 2010

Decided and Filed:  August 2, 2011

Before:  BOGGS and COOK, Circuit Judges; CARR, District Judge.[*]

_____

## COUNSEL

**ARGUED:** John F. Birmingham, Jr., FOLEY & LARDNER LLP, Detroit, Michigan, for Appellant.  Terrance G. Reed, LANKFORD & REED, PLLC, Alexandria, Virginia, for Appellees.  **ON BRIEF:**  John F. Birmingham, Jr., Larry S. Perlman, Jennifer L. Neumann, FOLEY & LARDNER LLP, Detroit, Michigan, for Appellant.  Terrance G. Reed, LANKFORD & REED, PLLC, Alexandria, Virginia, Christopher P. Legghio, LEGGHIO & ISRAEL, Royal Oak, Michigan, for Appellees.

_____

[*]The Honorable James G. Carr, Senior United States District Judge for the Northern District of Ohio, sitting by designation.

1

———————————

**OPINION**

———————————

COOK, Circuit Judge.  Plaintiff, an active and successful home builder, sued a national labor union and two of its officers for orchestrating an onslaught on the company's phone and e-mail systems.  Plaintiff appeals two orders in this combined appeal:  (1) the order denying its motion for a preliminary injunction and (2) the order granting Defendants' motion to dismiss.  We affirm in part and reverse in part.

I.

Pulte Homes, Inc.'s (Pulte['s]) complaint stems from an employment dispute. Pulte alleges that in September 2009 it fired a construction crew member, Roberto Baltierra, for misconduct and poor performance.  Shortly thereafter, the Laborers' International Union of North America (LIUNA) began mounting a national corporate campaign against Pulte—using both legal and allegedly illegal tactics—in order to damage Pulte's goodwill and relationships with its employees, customers, and vendors.

Just days after Pulte dismissed Baltierra, LIUNA filed an unfair-labor-practice charge with the National Labor Relations Board (NLRB).  LIUNA claimed that Pulte actually fired Baltierra because he wore a LIUNA t-shirt to work, and that Pulte also terminated seven other crew members in retaliation for their supporting the union.  Pulte maintains that it never terminated any of these seven additional employees.

Not content with its NLRB charge, LIUNA also began using an allegedly illegal strategy:  it bombarded Pulte's sales offices and three of its executives with thousands of phone calls and e-mails.  To generate a high volume of calls, LIUNA both hired an auto-dialing service and requested its members to call Pulte.  It also encouraged its members, through postings on its website, to "fight back" by using LIUNA's server to send e-mails to specific Pulte executives.  Most of the calls and e-mails concerned Pulte's purported unfair labor practices, though some communications included threats and obscene language.

Yet it was the volume of the communications, and not their content, that injured Pulte. The calls clogged access to Pulte's voicemail system, prevented its customers from reaching its sales offices and representatives, and even forced one Pulte employee to turn off her business cell phone. The e-mails wreaked more havoc: they overloaded Pulte's system, which limits the number of e-mails in an inbox; and this, in turn, stalled normal business operations because Pulte's employees could not access business-related e-mails or send e-mails to customers and vendors.

Four days after LIUNA started its phone and e-mail blitz, Pulte's general counsel contacted LIUNA. He requested, among other things, that LIUNA stop the attack because it prevented Pulte's employees from doing their jobs. When the calls and e-mails continued, Pulte filed this suit alleging several state-law torts and violations of the Federal Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030, a statute that both criminalizes certain computer-fraud crimes and creates a civil cause of action.

When it filed suit, Pulte simultaneously moved to preliminarily enjoin LIUNA's phone and e-mail campaign. The district court denied Pulte's motion, holding that it lacked jurisdiction under the Norris-LaGuardia Act (NLGA) to issue a preliminary injunction because the suit involves a labor dispute and LIUNA's campaign attempts to publicize that dispute. *See* 29 U.S.C. §§ 101, 104. Pulte appealed.

Despite Pulte's interlocutory appeal, the parties' legal battles raged on. The general counsel of the NLRB, acting on LIUNA's earlier charge, sued Pulte for unfair labor practices. LIUNA then moved to dismiss Pulte's federal complaint on two grounds: failure to state a claim; and labor preemption under both *San Diego Building Trades Council, Millmen's Union, Local 2020 v. Garmon*, 359 U.S. 236 (1959) ("*Garmon* preemption"), and *Lodge 76, International Association of Machinists v. Wisconsin Employment Relations Commission*, 427 U.S. 132 (1976) ("*Machinists* preemption"). Rather than address preemption, the district court (1) held that Pulte failed to state a claim under the CFAA, (2) withheld leave to amend, (3) declined to exercise supplemental jurisdiction over Pulte's state-law claims, and (4) dismissed the

entire suit with prejudice. Pulte appealed this decision as well, and we granted its motion to consolidate the two appeals.

We address the following issues: (A) preemption, (B) the sufficiency of Pulte's CFAA allegations, (C) Pulte's request for leave to amend, and (D) its motion for a preliminary injunction.

## II.

## A.

We tackle first one of LIUNA's alternative grounds for affirming the district court's judgment—that *Garmon* preemption bars Pulte's CFAA claims—because it questions our subject-matter jurisdiction. *See Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 607–10 (6th Cir. 2004).

*Garmon* strips courts of jurisdiction over conduct "arguably subject" to section 7 or section 8 of the National Labor Relations Act (NLRA), 29 U.S.C. §§ 157–58, and requires them to "defer to the exclusive competence of the National Labor Relations Board." *Trollinger*, 370 F.3d at 609 (internal quotation marks and citation omitted). Sections 7 and 8 of the NLRA together protect certain labor practices and prohibit others, thus forcing courts to relinquish jurisdiction to the NLRB when a suit involves an "arguably protected" or "arguably prohibited" labor practice. *Id.* at 608–09.

An exception to this general rule—the independent-federal-remedy exception—nevertheless allows federal courts to "decide labor law questions that emerge as collateral issues in suits brought under independent federal remedies." *Id.* at 609 (internal quotation marks and citation omitted). Our decision in *Trollinger* aptly illustrates the exception and demonstrates why it saves Pulte's CFAA claims—even if, as LIUNA contends, section 8(c) of the NLRA arguably protects its phone and e-mail campaign. *See* 29 U.S.C. § 158(c) (prohibiting injunctions against noncoercive labor speech).

In *Trollinger*, the plaintiffs brought civil RICO claims against their former employer and alleged, as the RICO predicate, that the employer depressed hourly wages by knowingly hiring undocumented illegal immigrants in violation of section 274 of the Immigration and Nationality Act (INA). 370 F.3d at 606–07, 611. The defendant-employer argued that *Garmon* deprived the district court of jurisdiction because the plaintiffs' wage-related RICO claims were arguably subject to the NLRA. *Id.* at 607, 611. We held, however, that the independent-federal-remedy exception preserved the district court's jurisdiction because the plaintiffs could prove that the employer violated section 274 of the INA without ever having to establish a violation of the NLRA. *Id.* at 611.

The exception compels the same result here. The CFAA provisions upon which Pulte relies prohibit knowingly transmitting information that damages a computer, 18 U.S.C. § 1030(a)(5)(A), and intentionally accessing a computer without authorization, *id.* § 1030(a)(5)(B), (C). Like section 274 of the INA, these provisions forbid conduct wholly unrelated to the labor laws, thus allowing Pulte to prove—without implicating the NLRA—that LIUNA's calls and e-mails violated the CFAA. *See Trollinger*, 370 F.3d at 611. And neither the prospect of LIUNA defending itself here by arguing that its campaign qualifies as protected activity nor the possibility of either party filing prohibited-conduct charges with the NLRB—which LIUNA already has done—removes potential NLRA issues from the collateral-issue category. *See id.* As a result, *Garmon* preemption does not preclude Pulte's CFAA claims.

LIUNA also asks us to affirm the dismissal of Pulte's CFAA claims under the *Machinists* preemption doctrine, which forbids both states and the NLRB from "regulat[ing] conduct that Congress intended be unregulated because left to be controlled by the free play of economic forces." *Chamber of Commerce of the U.S. v. Brown*, 554 U.S. 60, 65 (2008) (internal quotation marks and citation omitted). But, as Pulte observes, LIUNA cites not a single case where a court applied the *Machinists* preemption doctrine to bar a *federal* rather than a *state* claim. And we see no reason to create such a precedent now.

B.

Having satisfied ourselves of subject-matter jurisdiction, we next address the dismissal of Pulte's CFAA claims under Federal Rule of Civil Procedure 12(b)(6). The district court held that Pulte failed to state either (1) a "transmission" claim, *see* 18 U.S.C. § 1030(a)(5)(A), or (2) an "access" claim, *see id.* § 1030(a)(5)(B), (C). We review its decision de novo, *Louisville/Jefferson Cnty. Metro Gov't v. Hotels.com, L.P.*, 590 F.3d 381, 384 (6th Cir. 2009), asking whether the complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (internal quotation marks and citation omitted).

1.

To state a transmission claim, a plaintiff must allege that the defendant "knowingly cause[d] the transmission of a program, information, code, or command, and as a result of such conduct, intentionally cause[d] damage without authorization, to a protected computer." 18 U.S.C. § 1030(a)(5)(A). We assume, because it is not disputed, that LIUNA's communications constitute "transmissions," *see id.*, and that Pulte's phone and e-mail systems qualify as "protected computers," *see id.* § 1030(e)(2). According to LIUNA and the district court, however, Pulte fails to allege that LIUNA "intentionally caused damage." We address damages and intent—in that order—and conclude that Pulte properly alleges both.

a.

Pulte describes the effects of LIUNA's conduct at length in its complaint. Summarized, the calls impeded access to voicemail, prevented Pulte's customers from reaching its sales offices and representatives, and forced an employee to turn off her cell phone. And LIUNA's e-mails—which overloaded Pulte's system—curtailed normal business operations because Pulte's employees could not access and respond to e-mails. The parties dispute whether this constitutes damage under the CFAA.

To understand "damage," we consult both the statutory text and ordinary usage. Under the CFAA, "any impairment to the integrity or availability of data, a program, a system, or information" qualifies as "damage." *Id.* § 1030(e)(8). Because the statute includes no definition for three key terms—"impairment," "integrity," and "availability"—we look to the ordinary meanings of these words. *See United States v. Plavcak*, 411 F.3d 655, 660–61 (6th Cir. 2005). "Impairment" means a "deterioration" or an "injurious lessening or weakening." 7 Oxford English Dictionary 696 (2d ed. 1989) [hereinafter OED]. The definition of "integrity" includes an "uncorrupted condition," an "original perfect state," and "soundness." *Id.* at 1066. And "availability" is the "capability of being employed or made use of." 1 OED, *supra*, at 812. Applying these ordinary usages, we conclude that a transmission that weakens a sound computer system—or, similarly, one that diminishes a plaintiff's ability to use data or a system—causes damage.

LIUNA's barrage of calls and e-mails allegedly did just that. At a minimum, according to the complaint's well-pled allegations, the transmissions diminished Pulte's ability to use its systems and data because they prevented Pulte from receiving at least some calls and accessing or sending at least some e-mails. *Cf. Czech v. Wall St. on Demand, Inc.*, 674 F. Supp. 2d 1102, 1117–18 (D. Minn. 2009) (dismissing a CFAA transmission claim because the plaintiff failed to allege that the defendant's text messages stopped her from receiving or sending any calls or text messages).

The diminished-ability concept that we endorse here is not novel: several district courts have already adopted it. *See, e.g.*, *Condux Int'l, Inc. v. Haugum*, Civil No. 08-4824 ADM/JSM, 2008 WL 5244818, at *8 (D. Minn. Dec. 15, 2008) ("The 'damage' contemplated by subsection (a)(5)(A)(i) requires some diminution in the completeness or useability of data or information on a computer system." (internal quotation marks and citation omitted)); *Becker v. Toca*, Civil Action No. 07-7202, 2008 WL 4443050, at *5 (E.D. La. Sept. 26, 2008) ("Error messages and slow processing constitute impairments to the integrity or availability of data."); *Am. Online, Inc. v. Nat'l Health Care Disc., Inc.*, 121 F. Supp. 2d 1255, 1274 (N.D. Iowa 2000) ("[W]hen a large volume

of [unsolicited bulk e-mail] causes slowdowns or diminishes the capacity of AOL to serve its customers, an 'impairment' has occurred to the 'availability' of AOL's 'system.'").

Moreover, our interpretation comports with two decisions from sister circuits. The Third Circuit sustained a transmission conviction where the defendant "admitted that in using the direct e-mailing method and sending thousands of e-mails to one inbox, the targeted inbox would flood with e-mails and thus impair the user's ability to access his other 'good' e-mails." *United States v. Carlson*, 209 F. App'x 181, 185 (3d Cir. 2006). And the Seventh Circuit, in *United States v. Mitra*, upheld the defendant's transmission conviction because he impaired the availability of an emergency communication system when "[d]ata that [he] sent interfered with the way the computer allocated communications to the other 19 [radio] channels and stopped the flow of information among public-safety officers." 405 F.3d 492, 494 (7th Cir. 2005). That these decisions involve criminal prosecutions is irrelevant. *See Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004) ("[W]e must interpret [a] statute consistently, whether we encounter its application in a criminal or noncriminal context . . . ."). In both cases, the government proved beyond a reasonable doubt that the transmissions impaired the availability of the computer equipment; here, Pulte adequately alleges that result.

Because Pulte alleges that the transmissions diminished its ability to send and receive calls and e-mails, it accordingly alleges an impairment to the integrity or availability of its data and systems—i.e., statutory damage.

b.

Damage alone, however, is not enough for a transmission claim. A defendant must also cause that damage with the requisite intent.

The district court found Pulte's intent allegations deficient: it dismissed Pulte's claim because Pulte failed to allege that LIUNA *knew* its calls and e-mails would harm Pulte's computer systems. *See Pulte Homes, Inc. v. Laborers' Int'l Union*, No. 09-13638, 2010 WL 1923814, at *3 (E.D. Mich. May 12, 2010) ("Plaintiff did not inform

Defendants that their conduct was harmful to any of Plaintiff's computer systems."). In other words, Pulte made no allegation that LIUNA fully grasped the *actual* consequences of its e-mail campaign. This is too high a standard.

The transmission subsection prohibits causing damage "intentionally." 18 U.S.C. § 1030(a)(5)(A). We turn, again, to ordinary usage because the CFAA does not define the term. To act "intentionally" commonly means to act "on purpose"—i.e., with a purpose or objective. 7 OED, *supra*, at 1080. The Third Circuit, for example, sustained a CFAA transmission conviction where the jury instructions provided that "[a] person acts intentionally when what happens was the defendant's conscious objective." *Carlson*, 209 F. App'x at 184–85 (internal quotation marks and citation omitted). Thus, to satisfy its pleading burden, Pulte must allege that LIUNA acted with the conscious purpose of causing damage (in a statutory sense) to Pulte's computer system—a standard that does not require perfect knowledge.

Pulte met its burden. The following allegations illustrate LIUNA's objective to cause damage: (1) LIUNA instructed its members to send *thousands* of e-mails to three specific Pulte executives; (2) many of these e-mails came from LIUNA's server; (3) LIUNA encouraged its members to "fight back" after Pulte terminated several employees; (4) LIUNA used an auto-dialing service to generate a high volume of calls; and (5) some of the messages included threats and obscenity. And although Pulte appears to use an idiosyncratic e-mail system, it is plausible LIUNA understood the likely effects of its actions—that sending transmissions at such an incredible volume would slow down Pulte's computer operations. LIUNA's rhetoric of "fighting back," in particular, suggests that such a slow-down was at least one of its objectives. The complaint thus sufficiently alleges that LIUNA—motivated by its anger about Pulte's labor practices—intended to hurt Pulte's business by damaging its computer systems.

LIUNA attempts—but fails—to justify its conduct. Though it maintains that the calls and e-mails are "fully consistent with an ongoing, lawful, organizing campaign" through which it "is attempting [only] to organize Pulte employees," LIUNA offers no explanation of how targeting Pulte's executives and sales offices—rather than employees

eligible for recruitment—advances its campaign. And an equally, if not more, plausible explanation is that LIUNA intended to disrupt Pulte's business by bogging down its computer systems. Rule 12(b)(6) demands nothing more. *See Iqbal*, 129 S. Ct. at 1949.

c.

In sum, because Pulte's complaint alleges that LIUNA "intentionally caused damage," we reinstate its CFAA transmission claim. *See* 18 U.S.C. § 1030(a)(5)(A). We also reverse the dismissal of its state-law claims and remand to the district court with instructions to determine whether it may exercise jurisdiction over those claims. *See Mills v. City of Barbourville*, 389 F.3d 568, 581 (6th Cir. 2004) (reversing the dismissal of state-law claims for lack of jurisdiction and remanding to district court to determine whether it should exercise supplemental jurisdiction).

2.

Though Pulte's transmission claim passes Rule 12(b)(6), we agree with the district court that its access claim does not.

Our path to this conclusion, however, departs from the district court's. *See Angel v. Kentucky*, 314 F.3d 262, 264 (6th Cir. 2002) ("[W]e are free to affirm . . . on any basis supported by the record."). To state an access claim, a plaintiff must allege, among other things, that the defendant "intentionally accesse[d] a protected computer without authorization." 18 U.S.C. § 1030(a)(5)(B), (C). The district court held that Pulte failed to allege "access." We need not decide whether LIUNA's calls and e-mails accessed Pulte's computers because, even if they did, Pulte does not allege access "without authorization."

Because Congress left the interpretation of "without authorization" to the courts, we again start with ordinary usage. The plain meaning of "authorization" is "[t]he conferment of legality; . . . sanction." 1 OED, *supra*, at 798. Commonly understood, then, a defendant who accesses a computer "without authorization" does so without sanction or permission. *See LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1132–33 (9th Cir. 2009).

In addition, comparing the phrase "without authorization" to another, somewhat similar phrase in the CFAA further informs the proper interpretation. The CFAA criminalizes both accessing a computer "without authorization" and "exceeding authorized access" to a computer. *E.g.*, 18 U.S.C. § 1030(a)(1). Despite some similarities in phrasing, we must, if possible, give meaning to both prohibitions. *See Daniel v. Cantrell*, 375 F.3d 377, 383 (6th Cir. 2004) ("We avoid interpretations of a statute which would render portions of it superfluous."); *cf. Int'l Airport Ctrs., L.L.C. v. Citrin*, 440 F.3d 418, 420 (7th Cir. 2006) (observing that "[t]he difference . . . is paper thin"). We can.

Unlike the phrase "without authorization," the CFAA helpfully defines "exceeds authorized access" as "access[ing] a computer with authorization and . . . us[ing] such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter." 18 U.S.C. § 1030(e)(6). Under this definition, "an individual who is authorized to use a computer for certain purposes *but goes beyond those limitations* . . . has 'exceed[ed] authorized access.'" *LVRC Holdings LLC*, 581 F.3d at 1133 (second alteration in original) (emphasis added). In contrast, "a person who uses a computer 'without authorization' *has no rights, limited or otherwise*, to access the computer in question." *Id.* (emphasis added); *accord Lockheed Martin Corp. v. Speed*, No. 6:05-CV-1580-ORL-31, 2006 WL 2683058, at *5 (M.D. Fla. Aug. 1, 2006) (observing that individuals "without authorization" have "no permission to access whatsoever").

We ask, then, whether LIUNA had *any* right to call Pulte's offices and e-mail its executives. It did—and LIUNA's methods of communication demonstrate why.

LIUNA used unprotected public communications systems, which defeats Pulte's allegation that LIUNA accessed its computers "without authorization." Pulte allows all members of the public to contact its offices and executives: it does not allege, for example, that LIUNA, or anyone else, needs a password or code to call or e-mail its business. Rather, like an unprotected website, Pulte's phone and e-mail systems "[were] open to the public, so [LIUNA] was authorized to use [them]." *See Citrin*, 440 F.3d at 420. And though Pulte complains of the number, frequency, and content of the

communications, it does not even allege that one or several calls or e-mails would have been unauthorized. Its complaint thus amounts—at most—to an allegation that LIUNA exceeded its authorized access.

Because Pulte does not allege that LIUNA possessed *no* right to contact Pulte's offices and its executives, it fails to satisfy one of the elements—access "without authorization"—of its claim. *See* 18 U.S.C. § 1030(a)(5)(B), (C).

C.

Pulte next asserts that the district court should have granted it leave to amend under Federal Rule of Civil Procedure 15(a). We have two options for our standard of review: (1) abuse of discretion, the general standard when a court denies a motion for leave to amend; or (2) de novo, the standard when a court denies leave to amend "because the amended pleading would not withstand a motion to dismiss." *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 698 (6th Cir. 2004), *abrogated on other grounds by Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1323–25 (2011), *as recognized in Frank v. Dana Corp.*, — F.3d —, No. 09–4233, 2011 WL 202717, at \*5 (6th Cir. May 25, 2011). Here, rather than filing a motion for leave to amend, Pulte buried its request in a footnote in its brief opposing the motion to dismiss; and the district court, in its order dismissing the complaint with prejudice, did not explain why it withheld leave to amend. The lesser standard, abuse of discretion, therefore applies. *See id.*

We cannot say that the district court abused its discretion in withholding leave to amend. Pulte had already amended its complaint once; it then failed to file a proper motion justifying another amendment; and it never moved to alter or amend the district court's judgment. Given this series of events, the district court acted within its discretion, and Pulte may not amend its access claim on remand. *See id.* at 699.

D.

Finally, Pulte faults the district court for concluding that it lacked jurisdiction to issue a preliminary injunction because LIUNA's calls and e-mails constitute protected publicity and assembly under subsections 4(e) and (f) of the NLGA. *See* 29 U.S.C. § 104(e), (f).

When a party appeals the denial of a preliminary injunction, we ask whether the district court abused its discretion—by, for example, applying an incorrect legal standard, misapplying the correct one, or relying on clearly erroneous facts. *Allied Sys. Ltd. v. Teamsters Nat'l Auto. Transporters Indus. Negotiating Comm., Local Union 327*, 179 F.3d 982, 985–86 (6th Cir. 1999). We therefore review the district court's legal conclusions de novo and its factual determinations for clear error. *Grand Trunk W. R.R. Inc. v. Bhd. of Maint. of Way Emps. Div.*, 497 F.3d 568, 571 (6th Cir. 2007). We agree with the district court that it lacked jurisdiction to issue the injunction, but our rationale differs: we rely instead on section 8 of the NLGA. *See* 29 U.S.C. § 108.

If a lawsuit involves or grows out of a "labor dispute," the NLGA deprives a court of jurisdiction to issue a preliminary injunction "except in a strict conformity with the provisions" of the NLGA. *Id.* § 101. Among the NLGA's rigid rules are several procedural safeguards. *See id.* §§ 107–09; *see also Lukens Steel Co. v. United Steelworkers*, 989 F.2d 668, 676 (3d Cir. 1993) (describing §§ 107–09 as "procedural requirements"). For example, before a preliminary injunction issues, the district court must hold an evidentiary hearing and make findings of fact, and the plaintiff must post a bond. 29 U.S.C. § 107. Because the district court here held that Pulte's complaint springs from a labor dispute—a holding that Pulte refrains from challenging on appeal—the NLGA's procedural requirements apply. Pulte, however, failed to comply with one of these safeguards: section 8 of the NLGA.

Section 8 prohibits a court from granting an injunction "to any complainant . . . who has failed to make every reasonable effort to settle [a labor] dispute . . . by negotiation." *Id.* § 108. Where the litigants agree on the complainant's attempts to settle the dispute, "it is solely a legal question whether those efforts constitute 'every

reasonable effort.'" *Grand Trunk*, 497 F.3d at 572.  Pulte's settlement efforts—devoid of any attempt to confer with LIUNA's attorneys before filing suit—fail the every-reasonable-effort test and thus prevent resort to injunctive remedies.

The events leading up to this suit moved swiftly.  Pulte fired Baltierra on September 4, prompting the September 9 onset of LIUNA's communications deluge.  Four days later—on Sunday, September 13—Pulte's general counsel faxed and overnighted a cease-and-desist letter to LIUNA, in which Pulte demanded that LIUNA stop encouraging the calls and e-mails and that it "use every means available to [it] to put an end to this activity."  The letter cautioned that Pulte intended to seek injunctive relief unless LIUNA "promptly provide[d] . . . adequate assurances that this conduct will cease immediately."  When the calls and e-mails did not stop by the morning of Tuesday, September 15, Pulte filed this suit.

Pulte made little to no effort to settle.  It transmitted the cease-and-desist letter on a Sunday, did not specify a time to respond, did not offer LIUNA an opportunity to negotiate, and filed suit less than forty-eight hours after sending the letter without even confirming that LIUNA received the letter.  This is not "every reasonable effort" to settle the dispute.

Rather than defend the reasonableness of its settlement efforts, Pulte asks us to absolve it of its section 8 obligations, offering two justifications for doing so.  First, LIUNA is not the bargaining representative for Pulte's employees; and second, LIUNA's calls and e-mails included violent threats and destroyed Pulte's computer system.  Neither of these arguments excuses non-compliance with section 8.

As to its bargaining-representative argument, Pulte misconstrues the only case upon which it relies, *Grace Co. v. Williams*, 20 F. Supp. 263 (W.D. Mo. 1937).  *Grace Co.* did not hold, as Pulte contends, "that an employer has no obligation under [section 8 of the NLGA] to negotiate with a union that is not the bargaining representative of its employees."  Rather, *Grace Co.* carved out an exception to the NLGA's every-reasonable-effort requirement where requiring an employer to negotiate with a non-representative union would force the employer to violate its duties under the Wagner

Act—a situation not present here. *See id.* at 267; *see also San Antonio Cmty. Hosp. v. S. Cal. Dist. Council of Carpenters*, 125 F.3d 1230, 1233, 1238 (9th Cir. 1997) (applying section 8 to a picketing dispute between a hospital and a union even though the union did not represent the hospital's employees). Pulte, overlooking the rationale for the bargaining-representative exception, unfairly broadens *Grace Co.*'s holding.

Pulte's violence-and-destruction argument also misses the mark. Citing two decisions in which courts enjoined brawls between members of competing unions, Pulte contends that section 8 does not apply in cases involving violence, threats of violence, or destruction of property. *See Cater Const. Co. v. Nischwitz*, 111 F.2d 971, 977 (7th Cir. 1940); *J. B. Michael & Co. v. Iron Workers Local No. 782*, 173 F. Supp. 319, 326 (W.D. Ky. 1959). But Pulte does not allege that LIUNA committed any violent acts. *Cf. J. B. Michael & Co.*, 173 F. Supp. at 323 (finding that defendants threw rocks, used pick handles and iron bars as clubs, broke automobile windshields, brandished pistols, and inflicted a head injury requiring twenty stitches). And while some callers cautioned Pulte's employees that they would "rot in hell," and other callers threatened to "come down" to Pulte's offices and "find out who [the employee] is" and "what [his or her] problem is," these unidentified callers did not threaten *violence*. *Cf. Cater Const. Co.*, 111 F.2d at 974–75 (issuing injunction where union's representative told employer that "there would be a fight" and "a lot of heads busted" if employer did not hire union's members (internal quotation marks omitted)). What remains is an allegation of nonviolent, albeit harassing, business disruption: that LIUNA's members clogged Pulte's communications systems simply by clicking a mouse and dialing a phone number. Yet Pulte cites no cases in which business disruption, unaccompanied by violence, relieves a complainant of its pre-injunction obligation to negotiate.

Pulte proffers one final, unpersuasive reason for reversing the district court. It argues that the NLGA does not foreclose injunctive relief under the CFAA—a more specific, later-enacted statute. The CFAA, however, regulates computer crimes rather than labor activity. And the NLGA's "ban on federal injunctions is not lifted" simply because a union's nonviolent conduct violates "some other nonlabor statute." *Crowe &*

*Assocs., Inc. v. Bricklayers & Masons Union Local No. 2 (In re Crowe & Assocs., Inc.)*, 713 F.2d 211, 214 (6th Cir. 1983) (internal quotation marks and citation omitted); *see also Triangle Constr. & Maint. Corp. v. Our V. I. Labor Union*, 425 F.3d 938, 944–45 (11th Cir. 2005) ("[T]he [NLGA] does not prevent courts from issuing injunctions to enforce *positive* duties imposed by other federal labor statutes." (emphasis added) (internal quotation marks and citation omitted)).  Regardless of the CFAA's specificity and date of enactment, its injunctive provisions afford Pulte no refuge.

Because Pulte failed to comply with section 8 of the NLGA, the district court lacked jurisdiction to issue the injunction—even if LIUNA's calls and e-mails fall short of protected publicity and assembly, *see* 29 U.S.C. § 104(e), (f), and even if Pulte satisfied the section 7 evidentiary requirements, *see id.* § 107.

## III.

For these reasons, we affirm in part and reverse in part the order dismissing Pulte's complaint, affirm the denial of the preliminary injunction, and remand for proceedings consistent with this opinion.